# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 50248 | **DATE** | 3/24/2011 |
| **CASE TITLE** | Miller et al. v. Illinois Department of Corrections | | |

**DOCKET ENTRY TEXT:**

Defendant's motion for summary judgment [35] is granted as to plaintiff Miles, and granted in part and denied in part as to plaintiff Miller.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

On November 11, 2008, plaintiffs, Marcia Miller and Lori Miles, filed a two-count complaint pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, against their employer, the Illinois Department of Corrections, alleging discrimination and a hostile work environment based on their sex (Count I), and retaliation (Count II). Defendant has filed a motion for summary judgment as to both counts. Plaintiffs concede that summary judgment is merited on Count II. Accordingly, defendant's motion is granted as to Count II. The court proceeds to consider defendant's motion as to Count I.

### I. BACKGROUND

The facts relating to Count I are as follows.[1] During all relevant times, plaintiffs worked for defendant as Correctional Leisure Time Activity Specialists ("LTS workers") at Dixon Correctional Center, a medium-maximum security prison for men. At all times relevant to the complaint, plaintiffs, along with one other woman, Roberta Royer, have been the only female LTS staff working for defendant. Their supervisor was Daniel Murray.

Generally, Dixon addresses the issue of sexual harassment of its workers in several ways. New employees receive training reviewing policies against discrimination and harassment, and the warden has issued annual bulletins against sexual harassment. Pursuant to the sexual harassment policy at Dixon, an employee who believes he or she is the victim of discrimination or harassment is to notify his or her immediate supervisor, the next person in the chain-of-command, or report the incident to the Office of Affirmative Action. If the employee is registering a complaint about harassment, the policy directs the employee to file an incident report.

According to plaintiffs, starting in 2003, co-workers, including correctional officers (COs), lieutenants, and sergeants, started spreading rumors that plaintiffs were having sex with inmates.[2] Plaintiffs heard of these statements from other officers, and from inmates.[3] Inmates specifically reported to plaintiffs that officers would refer to the LTS workers as "inmate lovers." When plaintiffs reported these comments to Murray, he told them that he could not take any action in response to their complaints if they did not identify the officer or officers who were engaging in the conduct, as well as dates and times, so that they could be recorded in an incident report.

## STATEMENT

In May 2005, an inmate became angry with Miles and accused Miles of having sex with inmates and showing her breasts. Miles complained to Murray, Chandler, and the IDOC Office of Internal Affairs, that she was concerned about her safety because the inmate was sending letters to Internal Affairs. Chandler referred the matter to the Office of Internal Affairs and the inmate was transferred from Dixon.

In September 2005, an officer who worked in the gatehouse told Miller that a psychology intern, whom she had never met, accused LTS workers of having sex with inmates. Miller reported this to Murray and Murray did not respond or direct Miller to write a report. In November 2005, CO Don Moroney informed Miller that "the reason security staff say that she is screwing inmates is because she is not putting out for [the security staff]." In December 2005, CO Chino also told plaintiffs that he had heard a rumor they were "having sex with inmates in the gym."

On February 22, 2006, Miller complained to Major Dirk Dusing, the CO shift commander, that COs were falsely accusing Royer of "blowing inmates." Miller did not hear these comments herself, but heard about them from CO Ron Rangel. On February 23, 2006, CO Rangel told Miles that he overheard some sergeants and a lieutenant say that Miller and Royer were doing inappropriate things with inmates in the gym. On February 26, 2006, CO Josh Lancaster told Miller that he heard an officer say "we are having sexual affairs with the inmates." However, Miller did not report this incident. At times between 2003 and 2008, Lieutenant Jack Burnell made statements to plaintiffs accusing Royer of having sex with inmates.

On March 1, 2006, Murray, Miller, and Royer discussed "hiring" a particular inmate. Murray commented that, if an inmate came to work for the LTS workers without being officially assigned there, that would be fraternization. He further stated that people would then say the LTS workers were having sex with the inmate.

On March 28, 2006, Miles and Miller filed incident reports regarding the conduct of CO Roger Dewey at a staff meeting. At the LTS staff meeting, Murray was discussing an administrative directive regarding sexual harassment. He asked each of the employees to sign a form stating that each received a copy of the directive. Dewey took the directive and tore it up, and stated "this is my copy." Chandler requested that Murray obtain incident reports from all LTS staff who witnessed the incident so that Dewey could be properly reprimanded. In March 2006, Miles initiated a charge of discrimination with the Illinois Department of Human Rights alleging a sexually hostile work environment.[4]

On April 24, 2006, Miller filed another incident report stating that on April 19, 2006, she was leaving the institution and asked "Have my cohorts left yet?" One of the officers replied yes. Miller jokingly said, "How dare they leave without me." In response, CO Dallas Thielen commented, "If you looked like an inmate they'd wait for you." In her report, Miller stated that Thielen's statement was derogatory and sexually harassing in nature and that female LTS workers regularly hear sexual statements referring to relations with inmates. After receiving the incident report, Chandler determined it was not the type of incident that was appropriate for referral to the IDOC Office of Affirmative Action.

In August 2006, Miller was sexually assaulted by an inmate, who snuck up behind her, pressed the front of his body up against her, and stated "let me get some of that." When she requested security assistance, security staff failed to respond for fifteen minutes. However, Miller did not call a staff-in-distress code on the radio, or indicate in her report that there were issues with response. Thereafter, the inmate was found guilty of sexual misconduct, received three months of segregation, and was transferred from Dixon.

On September 19, 2006, Miller reported to Murray that CO James Dietrich suggested to her that Royer was having sex with inmates. On September 20, 2006, Murray advised Miller to write an incident report regarding the comment. Chandler discussed the incident with the IDOC Office of Affirmative Action and referred the incident report for investigation. Janet Richmond at the Office of Affirmative Action investigated the allegations and found that the allegations could not be substantiated. On October 11, 2006, Chandler reiterated to staff that acts of discrimination or harassment were unacceptable and would not be tolerated. She

also directed that supervisors regularly share this information with their staff at monthly meetings. On March 5, 2007, plaintiffs filed complaints with the EEOC alleging that they were subject to a hostile work environment.

During 2008, Miller continued to have problems with CO Dietrich. Whenever she would enter a room, he would look her up and down and laugh. On June 13, 2008, an inmate told Miller that Dietrich described to inmates in a very sexually explicit manner how Miller was probably going to have sex with other inmates. Miller filed an incident report. On June 19, 2008, Chandler forwarded Miller's incident report to the Office of Affirmative Action, which investigated and determined that Miller's allegations could not be substantiated. Thereafter, Chandler directed the supervisory staff to discuss the expectations of appropriate conduct and professionalism with all Dixon staff. Dietrich was eventually moved.[5]

On August 23, 2008, CO Moroney told Miller that CO Dan Ford made a statement insinuating that Miller was having sex with an inmate. On August 26, 2008, Miller filed an incident report regarding the comment. CO Ford submitted a report denying the comment. On August 28, 2008, Chandler directed that a bulletin be circulated concerning the policy against sexual harassment. Miller complained to Murray that she did not receive a response to her August 23 incident report, and Murray informed Miller that it was never processed.

On many occasions during their monthly staff meetings, plaintiffs complained to Murray about the rumors that they were having sex with inmates. Murray responded by saying "consider the source," "pick your battles," and "you know how security is." When plaintiffs reported to Chandler that there were rumors going around that plaintiffs were having sex with inmates she said, "You need to have thicker skin" and "You realize you guys are working in a male institution?" Chandler does not recall ever receiving an incident report from Miles concerning allegations of sexual harassment.

## II. ANALYSIS

Summary judgment will be granted if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must identify the specific portions of the total record, which it believes establish the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." Id. at 325. A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining if there is an issue of material fact . . . the court views the record in the light most favorable to the non-moving party, and draws all reasonable inferences in that party's favor." McCann v. Iroquois Mem'l Hosp., 622 F.3d 745, 752 (7th Cir. 2010).

Title VII generally covers two types of employment discrimination: so-called discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or refusal to hire; and acts that create a hostile workplace, which are different in kind from discrete acts, and do not require tangible adverse employment actions. Turner v. The Saloon, Ltd., 595 F.3d 679, 683 (7th Cir. 2010). Plaintiffs' claims involve the latter type of discrimination. In the context of sexual discrimination, to assert a hostile-workplace claim a plaintiff must establish that (1) she was subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex;[6] (3) the acts were severe or pervasive enough to alter the conditions of employment such that it creates an abusive working environment; and (4) there is a basis for employer liability. Id. at 684; Scruggs v. Garst Seed Co., 587 F.3d 832, 840 (7th Cir. 2009).

Defendant argues summary judgment is merited in this case because (1) much of the conduct cited by

| STATEMENT |
|---|

plaintiffs is barred by the statute of limitations; (2) no reasonable juror could find the conduct directed toward plaintiffs was so severe or pervasive to create a hostile environment; and (3) IDOC took reasonable actions in response to the claims of which it had notice.

### A. Statute of Limitations

Title VII's statute of limitations provides that an EEOC charge must be filed, "within one hundred and eighty days after the alleged unlawful employment practice occurred" or, where the person aggrieved "has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice," within three hundred days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). Accordingly, because plaintiffs filed their EEOC claims on March 5, 2007, defendant argues that the unlawful employment practices raised by plaintiffs had to have occurred, at most, 300 days prior to the filing, or on or later than May 9, 2006.

"[T]he statute of limitations applies differently depending on whether the plaintiff is asserting a claim for a discrete act of employment discrimination or for a hostile work environment." Turner, 595 F.3d at 684. For a hostile work environment claim, consideration of the entire scope of conduct, "including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability." Id. (quotation marks omitted). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). Thus, the court must determine whether the acts are part of the same actionable hostile work environment, and whether any act falls within the statutory period. Lucas v. Chi. Transit Auth., 367 F.3d 714, 724 (7th Cir. 2004).

Acts are part of the same actionable hostile work environment where they are connected in time or circumstances, such that they reinforce each other and can reasonably be linked together into a single chain or a single course of conduct. Id. at 727. Courts have looked to the similarity between employment actions and the persons involved as well as any gap in time between discriminatory acts alleged to determine which acts are part of the hostile environment claim. See Morgan, 536 U.S. at 120; Lucus, 367 F.3d at 727.

#### 1. Plaintiff Miller

Defendant first argues that much of the conduct directed toward Miller is barred by the statute of limitations because too much time lapsed between acts comprising the hostile work environment for them to be considered a single hostile environment claim. The court disagrees.

Miller provides evidence of four events which occurred within the statute of limitations: the sexual assault of Miller by an inmate, Miller's September 19, 2006 report regarding Dietrich's suggestion about Royer's sexual acts; Dietrich's June 13, 2008 comment about Miller having sex with other inmates; and Ford's August 23, 2008 statement insinuating that Miller was having sex with an inmate. Almost all of the conduct falling outside the statute of limitations involves similar statements either about Miller or to Miller concerning LTS staff members having sexual relationships with inmates. Although there does appear to be a gap in evidence of specific statements between late 2006 and mid-2008, the striking similarity of the nature of the conduct minimizes the impact of any gap in time. See Moore v. Metro. Water Reclamation Dist. of Greater Chi., No. 02 C 4040, 2004 WL 2958769, at *3 (N.D. Ill. Nov. 22, 2004) (holding that a less-than two-year gap in conduct did not affect the relatedness where other factors connected the conduct). Moreover, although the conduct was done by different employees, all of the employees involved in the conduct hold similar positions and have similar contact with Miller, and the chain of command and people in control remained the same throughout the course of the conduct. See Isaacs v. Hill's Pet Nutrition, Inc., 485 F.3d 383, 386 (7th Cir. 2007) ("As long as the employee remains within a single chain of command, however, and the same people control how the employer addresses problems in the workplace, there is only one employment practice, and all events may be considered . . . to determine whether that employment practice violates Title VII."). As such, previous comments by inmates and COs that

certain COs were saying LTS workers slept with inmates are part of the chain forming Miller's hostile environment claim.

One event that seems somewhat out of place is CO Dewey's act of tearing up the sexual harassment policy. This event occurred prior to the statute of limitations period and does not involve any comments about the LTS workers' sexual conduct. In addition, plaintiffs do not direct the court to any other conduct by CO Dewey that would make this incident any more related to Miller's other claims. As a result, the court will not consider this event as part of the course of conduct that makes up Miller's claim. Compare E.E.O.C. v. Caterpillar Inc., 503 F. Supp. 2d 995, 1032 (N.D. Ill. 2007) (excluding certain acts from the chain of events because "the conduct is entirely different in type than conduct that occurred within the statutory period.").[7]

Defendant also argues that because Miller was aware of her right to pursue her earlier claims previous to 2007, she should not get to include those acts in her hostile work environment claim. However, in Morgan, the Supreme Court rejected this argument, explaining that if sufficient activity occurred by day 100 to make out a claim, it does not matter "that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim" and the employee can make a claim involving all the actions. Morgan, 536 U.S. at 118; see also Turner, 595 F.3d at 684-85 (holding that acts occurring before the statute of limitations are included in a hostile work environment claim because one act occurred within the statute of limitations). Thus, the fact that Miller was aware of certain conduct in May 2006 does not exclude that conduct from being part of her claim.[8]

For the foregoing reasons, the court rejects defendant's statute of limitations argument regarding Miller. Pursuant to Morgan, the court will consider all conduct within the chain of events composing Miller's hostile work environment claim, even that which falls outside the statute of limitations, and will proceed to defendant's other arguments in regard to that claim.

## 2. Plaintiff Miles

Defendant's statute of limitations argument is more persuasive as to Miles. Although much of the conduct involving Miles has a similar connectedness to that alleged by Miller, Miles has failed to direct the court to evidence showing any act involving her falls within the statutory period.

The behavior directed at Miles by co-workers consists of (1) the pre-2004 staff meeting when Murray instructed Miles to stand up and turn around so that other LTS workers could see whether the length of her shorts was appropriate, (2) a May 2005 accusation by an inmate that Miles was having sex with inmates and showing her breasts; (3) the September 2005 incident in which a psychology intern accused LTS workers of having sex with inmates; (4) an incident in December 2005, in which, CO Chino told plaintiffs that he had heard a rumor they were having sex with inmates in the gym; (5) Lieutenant Jack Burnell's statements to Miles accusing Royer of having sex with inmates, (6) the February 23, 2006 incident in which CO Rangel told Miles that he overheard some sergeants and a lieutenant say that Miller and Royer were doing inappropriate things with inmates in the gym; (7) the February 26, 2006 incident in which CO Josh Lancaster told Miller that he heard an officer say LTS workers were having sexual affairs with the inmates; (8) the March 28, 2006 incident in which CO Roger Dewey tore up a copy of the sexual harassment policy; and (9) the April 2006 incident in which CO Thielen implied to Miller that her "cohorts" would wait for inmates. None of these discriminatory acts occurred after May 9, 2006.

Miles also presents more general facts, such as testimony that inmates told her COs had told them that the LTS workers were having sex with inmates, and statements made by Murray and Chandler in response to verbal complaints. However, Miles fails to direct the court to evidence showing the dates of these incidents, or the date of any statements by Burnell. There must be evidence in the record from which a trier of fact could conclude that the acts were committed after May 9, 2006, within the limitations period. Compare Lucas, 367 F.3d at 725. "In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the

evidence upon which the party relies." Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 490 (7th Cir. 2007).

The remaining conduct to which plaintiffs direct the court involves only Miller: Miller's sexual assault; Miller's September 19, 2006 report regarding Dietrich; Dietrich's June 13, 2008 comment regarding Miller; and Ford's statement insinuating that Miller was having sex with an inmate. Miles admits that she had no direct involvement in either the June 13, 2008 incident or Ford's statement. Nor does any evidence show that Miles had any involvement in Miller's sexual assault or with Dietrich's 2006 comment. Although the statements by Dietrich and Ford involve Miller's and Royer's activities with inmates, none of the statements referenced Miles. Nor were any of the statements made to Miles. Thus, while the content of the statements is similar to those rumors regarding Miles, none of these instances involved Miles.

As a result, the court cannot find that any of the events within the limitations period can be reasonably linked with the course of conduct directed at Miles prior to May 9, 2006, and as such, those acts are not part of the same hostile environment claim. Because Miles has not alleged an act falling within the statute of limitations, Miles cannot recover for the previous acts. See Morgan, 536 U.S. at 118. Therefore, defendant's motion for summary judgment is granted as to Miles.

B. Severe or Pervasive Environment

Defendant next argues that the evidence presented by Miller does not show the harassment she experienced was severe or pervasive enough to create a hostile work environment. In order to determine if the conduct at issue is severe or pervasive, courts consider a variety of factors, including the frequency of the conduct, the seriousness of the conduct, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with an employee's performance. Berry v. Chi. Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010); see also Turner, 595 F.3d at 685. The unwelcome conduct "must be both subjectively and objectively severe or pervasive." Berry, 618 F.3d at 691. "It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor." Minor v. Ivy Tech State College, 174 F.3d 855, 858 (7th Cir. 1999).

There are few instances in which mere rumors or sexual banter would establish a hostile working environment. Reiter v. Oshkosh Corp, No. 09-C-239, 2010 WL 2925916, at *4 (N.D. Wis. July 22, 2010); see also Pasqua v. Metro. Life Ins. Co., 101 F.3d 514, 517 (7th Cir. 1996). However, in certain circumstances a wide-spread and damaging rumor can form the basis of a hostile work environment claim. See Jew v. Univ. of Iowa, 749 F. Supp 946, 958-59 (S.D. Iowa 1990) (holding that the plaintiff suffered a hostile work environment where the discrimination against her was in large measure manifested by, and resulted from, false rumors that she gained favor with her department head by engaging in a sexual relationship with him). In fact, the Seventh Circuit has explicitly acknowledged that "[u]nfounded accusations that a woman worker is a 'whore,' a siren, carrying on with her coworkers, a Circe, 'sleeping her way to the top,' and so forth are capable of making the workplace unbearable for the woman verbally so harassed, and since these are accusations based on the fact that she is a woman, they could constitute a form of sexual harassment." McDonnell v. Cisneros, 84 F.3d 256, 259-260 (7th Cir. 1996).

Miller's hostile work environment claim is dominated by the several occasions in which she was told that other co-workers said she or other female co-workers were having sex with inmates: (1) in September 2005, Miller was told a psychology intern accused LTS workers of having sex with inmates; (2) in December 2005, CO Chino told Miller and Miles that he had heard a rumor LTS staff were "having sex with inmates in the gym"; (3) in or around February 2006, CO Ron Rangel told Miller COs were falsely accusing Royer of "blowing inmates"; (4) on February 23, 2006, CO Rangel told Miles that he overheard some sergeants and a lieutenant say that Miller and Royer were doing inappropriate things with inmates in the gym; (5) on February 26, 2006, CO Lancaster told Miller that he heard an officer say female LTS workers "are having sexual affairs with the

inmates"; (6) on April 19, 2006, CO Dallas Thielen commented, "If you looked like an inmate they'd wait for you," after Miller stated, "Have my cohorts left yet?"; (7) on September 19, 2006, Miller reported to Murray that CO James Dietrich suggested to her that Royer was having sex with inmates; (8) on June 13, 2008, an inmate told Miller that Dietrich described to inmates in a very sexually explicit matter how Miller was probably going to have sex with other inmates; (9) on August 23, 2008, Miller was told that CO Dan Ford made a statement insinuating that Miller was having sex with an inmate; and (10) at times between 2003 and 2008, Burnell made statements to Miller accusing Royer of having sex with inmates.[9]

In addition to these comments, Miller has presented evidence of conversations in which other employees suggested why the rumors were circulating: in November 2005, CO Moroney stated to Miller that "the reason security staff say that she is screwing inmates is because she is not putting out for them," and on March 1, 2006, Murray commented that, if an inmate came to work for the LTS workers without being officially assigned there people would then say the LTS workers were having sex with the inmate.[10]

### 1. Frequency of Conduct

Although the exact number of times co-workers accused Miller and other LTS workers of having sex with inmates is unclear, plaintiffs have presented evidence that the conduct occurred quite often.[11] In later 2005 and 2006 there were at least eight instances in which Miller was either the subject of or told these rumors. Although there appears to be a lull in 2007, the rumors again surfaced as to Miller in 2008. Moreover, plaintiffs presented testimony by Miles that for many years Miller, Royer, and Miles complained to Murray "many, many, many, many times." In addition, Miller testified that many COs have heard "forever" that LTS females are having sex with inmates. "It is like common knowledge at Dixon Correctional Center." As an example of how widespread the rumors were, Miller pointed out that she believed new employees and people who had no reason to know her or ever meet her had repeated that LTS workers had sex with inmates. The widespread nature of the rumors is also evidenced by the fact that Murray commented on the likelihood that others would speculate LTS workers were having sex with inmates if an inmate who was unassigned to the unit worked there. As a result of this testimony and examples of other conduct, a reasonable juror could conclude the conduct occurred fairly frequently and that the rumors were widespread.

### 2. Seriousness and Physical Threat of Conduct

Defendant argues the seriousness of the conduct is not great because Miller did not directly hear the comments about her, many of them were made about others, and the officers who made the accusations were never identified. To some extent, the court agrees. Miller did not hear the comments firsthand, but through other co-workers who reported what was being said about her. To the extent that these comments were not made directly to Miller, they may have been less wounding then if said in person. See Yuknis v. First Student, Inc., 481 F.3d 552, 555-56 (7th Cir. 2007) ("Offense based purely on hearsay or rumor really is 'second hand'; it is less credible, and, for that reason and also because it is less confrontational, it is less wounding than offense based on hearing or seeing . . . ."); Mannie v. Potter, 394 F.3d 977, 983 (7th Cir. 2005) (holding that comments made about plaintiff out of her presence were less damaging). In addition, some of the conduct of which Miller complains concerned other employees and thus, would not have had the same damaging effect on her or her reputation. See Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997) (holding that although "incidents-directed at others and not the plaintiff-do have some relevance in demonstrating the existence of a hostile work environment . . . the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff"). In addition, rumors, in and of themselves, are not physically threatening.

That being said, however, the seriousness of the conduct in this case is hardly negligible. Although the comments were not said to Miller directly, learning of widespread workplace comments that implied she was sexually promiscuous could have reasonably caused her to feel uncomfortable in her place of work. Moreover,

the comments must be taken in the context of the prison environment. Although Miller's co-workers may not have been accusing Miller of the conduct directly, the fact that they were making these statements to or in front of inmates could cause a reasonable juror to conclude that comments were more egregious and possibly more threatening. Moreover, although in Yuknis and Mannie courts treated conduct not directly observed by the plaintiffs less seriously, the facts of those cases differed sharply from those here. In Yuknis, the employee heard a rumor that her manager watched pornography on his computer, and in Mannie, the rumors concerned the plaintiff's mental stability, not her sexual promiscuity. In sum, in Yuknis the rumor did not involve plaintiff, and in Mannie the rumors were not sexually charged.

Here, the rumors involved Miller's sexual reputation. In addition, co-workers discussed with Miller similar graphic sexual allegations made about her colleagues. Although isolated incidents of such comments could be viewed as merely a lack of sensitivity or tact, a reasonable juror could conclude that the fact that the comments were frequently directed at Miller, described specific sexual acts she would allegedly perform, and tended to effect her reputation throughout the prison, made the conduct more serious. See McDonnell, 84 F.3d at 259-60. A reasonable juror could also conclude the repetition of such rumors by staff to inmates was humiliating to Miller. Compare Jew, 749 F. Supp. at 958-59.

### 3. Interference with Employment

Defendant also argues that the conduct was not so objectively severe or pervasive that interfered with Miller's employment. In this case, a reasonable juror could conclude the nature and frequency of the rumors involved were humiliating and degrading to Miller, such that they could have created a change in her work environment. Although the plaintiff has not presented specific evidence that the rumors played a role in the attack by an inmate, such rumors that plaintiff was having sex with inmates could create an environment that would embolden inmates to approach plaintiff or force themselves on her. Moreover, a reasonable juror could find that the rumors following the sexual assault plaintiff experienced touched on an incident likely upsetting to Miller and might have exacerbated or reinforced Miller's negative experience from the assault. Compare Lapka v. Chertoff, 517 F.3d 974, 984 (7th Cir. 2008) (holding that the continued presence of a rapist in the victim's workplace helped to create a severe or pervasive environment).

### 4. Summary

After evaluating all the necessary factors, when the evidence is viewed in the light most favorable to plaintiff, a reasonable juror could determine that the conduct Miller experienced was pervasive enough to create a hostile work environment. Although much of the conduct directed toward Miller would not create a hostile work environment when viewed independently, when viewed as a whole in favor of plaintiff, a reasonable juror could conclude that the amount of rumors about Miller's sexual encounters with inmates combined with several comments about her co-workers' similar sexual encounters, and the fact that these rumors continued after plaintiff was sexually assaulted by an inmate, pervaded Miller's environment to the extent it became hostile. Accordingly, there is a genuine issue of material fact as to whether the conduct at issue was severe or pervasive and summary judgment cannot be granted on those grounds.

### C. Employer Liability

Even if a plaintiff can establish a hostile environment based on sex, however, it does not necessarily follow that her employer is liable under Title VII. Bernier v. Morningstar, Inc., 495 F.3d 369, 373 (7th Cir. 2007). "Instead, where, as here, plaintiff attempts to hold the employer liable for the actions of a co-worker,

| STATEMENT |
|---|

the plaintiff bears the burden of showing that the employer knew of the problem . . . and that the employer did not act reasonably to equalize working conditions once it had knowledge." Id. (quotation marks omitted); see also Montgomery v. Am. Airlines, Inc., ___ F.3d ____, 2010 WL 4670173, at *5 (7th Cir. Nov. 19, 2010). An employer may be liable for a hostile work environment created by employees when the employer does not promptly and adequately respond to employee harassment." Sutherland v. Wal-Mart Stores, Inc., ___ F.3d ___, 2011 WL 181487, at *4 (7th Cir. Jan. 21, 2011).[12]

### 1. Knowledge

In order to evaluate whether a reasonable juror could find that defendant took reasonable steps in response to the conduct directed at Miller, the court must first assess what defendant knew. "With respect to the extent of the notice given to an employer, a plaintiff cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1035 (7th Cir. 1998) (quotation marks omitted).

In order for the employer to be liable, an employee must report information about employees committing improper conduct to someone who has some sort of duty to channel the complaints to those who are empowered to act upon such a complaint. Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir. 1997). "Where an employer sets up a point person to accept complaints, this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." Parkins, 163 F.3d at 1035 (quotation marks omitted). Thus, where a direct, albeit low-level, supervisor is identified in the employment policy as someone who can receive and relay such complaints, notification to this person is notice to the corporation. See Young, 123 F.3d at 675 (holding that the plaintiff's notice department head was notice to the company because the defendant's internal policy specified this person as an authorized channel for lodging a complaint).

Defendant has a policy setting forth procedures for initiating a review of complaints of sexual harassment made by employees which provides that any employee who believes that he or she is the victim of harassment shall notify (1) the employee's immediate supervisor, (2) the next person in the chain-of-command, if the employee's immediate supervisor is the person involved in the harassment, or (3) report the conduct to the Office of Affirmative Action. All three options direct the employee to file an incident report in addition to the verbal notification to the persons set forth above.

Miller admits she did not specifically report several incidents discussed above either verbally or in writing. She did not report Moroney's suggestion that the rumors existed because the LTS staff refused to have sex with guards. Nor did she report Lancaster's comment that LTS staff members were having sex with inmates. In addition, Miles did not report that Rangel overheard sergeants and a lieutenant say that Miller and Royer were doing inappropriate things with inmates in the gym. Moreover, plaintiffs have not directed the court to any evidence that either plaintiff reported the comments by Burnell. As a result, defendant cannot be charged with knowledge of these incidents.

Miller has presented evidence that the remaining incidents, those numbered (1), (2), (3), (6), (7), (8), (9) in Section II.B, were reported to defendant in some manner.[13] Although Miller did not file an incident report in every instance, she did report several specific incidents to her immediate supervisor, as directed by her employer's policy. As such, Miller gave her employer notice of these incidents.

Defendant points out that plaintiff did not record every incident reported to Murray in an incident report as required by the sexual harassment policy. However, defendant does not direct the court to any case holding that in order to show she notified the employer, an employee must prove she followed the employer's sexual harassment policy exactly and without variation. Rather, the reason an employee's compliance with an employer's policy is relevant is to determine whether an employer had actual notice of the harassment.

Bombaci, 482 F.3d at 983-84; see also Parkins, 163 F.3d at 1035 (explaining that the court looks to the employer's designated channel for complaints in order to determine knowledge because it would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee). The Seventh Circuit has acknowledged that although an employee should use the employers' mechanism to report harassment, there could be instances where a report in variation of the policy is sufficient to put an employer on notice. Durkin v. City of Chi., 341 F.3d 606, 612 (7th Cir. 2003). In fact, in Phelan v. Cook County, the Seventh Circuit specifically stated that "where [verbal] complaints that do not technically comply with the company's internal procedure are nonetheless sufficient- [defendant] cannot reasonably claim that it did not have sufficient notice of [plaintiff's] harassment where she continually complained of physical and verbal abuse . . . ." 463 F.3d 773, 786 (7th Cir. 2006); see also Erickson v. Wis. Dep't of Corr., 469 F.3d 600, 606 (7th Cir 2006) (holding that employee's verbal notice to her supervisors at a bar was enough); Hicks v. Sheahan, No. 03 C 0327, 2004 WL 3119016, at *16 (N.D. Ill. Dec. 20, 2004) (considering a similar DOC harassment policy and holding that the plaintiff's "failure to follow the technical requirement of submitting his complaint in writing does not automatically defeat this claim.").

In this case, there is no dispute that plaintiffs reported the incident to their "immediate supervisor" and notified defendant of the harassment through the channel defendant had identified. That plaintiff did not file a written report of this incident does not change the fact that defendant was notified by some appropriate means. Therefore, plaintiff's claim is not barred because she failed to file a written report in accord with defendant's policy.

### 2. Reasonable Response

Once an employer knows of conduct causing a hostile work environment "an employer satisfies its legal duty in coworker harassment cases if it takes reasonable steps to discover and rectify acts of harassment of its employees." Bernier, 495 F.3d at 373 (alteration and quotation marks omitted). Thus, if the employer takes "prompt action that was reasonably likely to prevent a reoccurrence, it cannot be liable." Berry, 618 F.3d at 692; see also Sutherland, 2011 WL 181487, at *4. The assessment of an employer's actions begins by evaluating the steps the employer actually took. Sutherland, 2011 WL 181487, at *4. The steps an employer "failed to take are only relevant if the steps it actually took were not reasonably likely to end the harassment." Id.

"[W]hat is reasonable depends on the gravity of the harassment. Just as in conventional tort law a potential injurer is required to take more care, other things being equal, to prevent catastrophic accidents than to prevent minor ones, . . . an employer is required to take more care, other things being equal, to protect its female employees from serious sexual harassment than to protect them from trivial harassment." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 432 (7th Cir. 1995) (citations omitted). For example, if a co-worker assaults the plaintiff, due care might require the company to fire the co-worker on the spot whereas a reasonable reaction to lesser forms of harassment may be less extreme. See id. Moreover, the employer's actions need not prevent the harassment, but must be reasonably likely to prevent future harassment. Parkins, 163 F.3d at 1036.

### a. Steps Taken By Defendant

Plaintiffs have presented evidence that either Miller or Miles reported several incidents involving Miller to defendant in a variety of ways. In September 2005, Miller told Murray she was told a psychology intern accused LTS workers of having sex with inmates. In December 2005, Miles told Murray that CO Chino said he had heard a rumor LTS staff were having sex with inmates in the gym. In February 2006, Miller told Major Dusing and Murray that Rangel heard COs falsely accusing Royer of "blowing inmates." On April 24, 2006, Miller filed an incident report regarding Thielen's comment that her co-workers would wait for her if she was an inmate. In August 2006, Miller reported that she was sexually assaulted by an inmate. In September, 2006, Miller filed an incident report stating that Dietrich suggested Royer was having sex with inmates. On June 13,

2008, Miller filed an incident report stating that Dietrich described to inmates in a very sexually explicit matter how Miller was probably going to have sex with other inmates. On August 26, 2008, Miller filed an incident report stating that CO Dan Ford made a statement insinuating that Miller was having sex with an inmate. In addition, both Miller and Miles testified that on multiple occasions they informed Murray and Chandler of rumors LTS workers were having sexual relations with inmates.

In the instances in which Miller filed an incident report, Chandler reviewed the report. In the case of Thielen, Chandler determined that the case did not warrant a referral to the Office of Affirmative Action. In the case of Miller's two complaints about Dietrich, Chandler referred the reports to the Office of Affirmative Action, where the allegations were investigated and a finding was made that the allegations could not be substantiated. In both instances, Chandler reiterated the sexual harassment policy to staff and directed the supervisory staff to discuss expectations of appropriate conduct and professionalism with staff. Dietrich was ultimately transferred from working with Miller. In response to the comment by Ford, Ford reported he did not make the comment, and Chandler again directed the sexual harassment policy be circulated. As to the sexual assault, the inmate was found guilty of sexual misconduct, received three months in segregation and was then transferred.

In contrast, defendant's verbal response to plaintiff's reports about pervasive rumors throughout the facility was to do nothing. Miles testified that in response to the numerous times she and others reported the rumors to Murray, he responded that they had to consider the source and pick their battles. She also testified that they reported the rumors to Chandler as well and she responded by saying that they needed to have thicker skin. Murray avers that although Miller and Miles reported the rumors to him, he would not do anything because they would not identify the individuals involved. Although an employee has an obligation to cooperate in the investigation of the harassment by his employer, see Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 637-38 (7th Cir. 2009) (holding that an "'employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment'"), there is evidence that shows plaintiffs were not deliberately withholding the names from Murray, but did not know who had initiated the rumor.

Certainly the immediate investigation of Miller's written complaints, followed by actions such as transferring the inmate involved in the sexual assault, would be reasonable responses to these individual incidents.[14] However, these responses did not address the widespread nature of the frequent rumors that plaintiffs reported. As such, the court finds that in this case there are several reasons a reasonable juror could conclude that defendant's response to the reports of harassment was not reasonably likely to prevent a reoccurrence. A reasonable juror could conclude the defendant's response was not reasonably likely to stop the harassment because although defendant addressed each written concern individually and in an isolated manner, its response did not address the other rumors that Miller and others verbally reported to Murray and Chandler. Compare Isaacs, 485 F.3d at 386 (holding that the plaintiff "complained repeatedly to supervisors and management-level personnel . . . about how the men were treating her, and she received the same response every time: one or another variation on 'grin and bear it.' . . . Doing nothing after receiving multiple complaints about serious conditions is a straight road to liability under Title VII."). A reasonable juror could conclude that defendant's response failed to confront the larger issue afflicting Miller, which was that the rumors about Miller occurred frequently and arose from several different sources around the facility. A reasonable juror could also conclude that defendant was on notice that its response of circulating the general policy was ineffective when reports of the rumors continued after that measure was attempted, and thereafter, defendant's similar response was not reasonably calculated to stop the harassment. Compare Phelan, 463 F.3d at 785 (finding that a question of fact remained as to whether plaintiff's transfer constituted a sufficient remedial measure since there was substantial evidence that the harassment continued after the transfer).

# STATEMENT

### b. Steps Defendant Failed to Take

Because the court concludes that plaintiff has presented evidence from which a reasonable juror could conclude the efforts defendant took were not reasonably likely to end the harassment, the court will now review what defendant could have done. See Sutherland, 2011 WL 181487, at *4. The court asked the parties to submit supplemental briefing on this issue. Although defendant maintains that it could not have done anything more than regularly remind all of its employees of its policy against discrimination and sexual harassment, plaintiffs have suggested several reasonable responses defendant could have made.

Plaintiff suggests that defendant could have thoroughly investigated each and every complaint from plaintiffs that co-workers circulated rumors that female LTS workers were having sex with inmates. Plaintiffs maintain that although they did not know the specific names of the persons spreading such rumors, they could, at times, identify the type of employee who made the comment, the shift during which the comment was made, or the area of the prison where the comment was shared which would have enabled defendant to focus its investigation. Plaintiffs also suggest that, apart from simply reiterating the anti-discrimination policy, defendant could have explained to its employees specifically that spreading rumors about sexual misconduct between female employees and the prison's male inmates is not only sexual harassment, but creates a dangerous working environment for female employees. The court agrees that a reasonable juror could find these would have been reasonable responses to the harassment.

### c. Summary

Although the court agrees with defendant that without specific information and evidence it is nearly impossible to stop such a rumor, this alone does not absolve defendant of responsibility. No one could argue an employer must completely silence a vicious and harmful rumor in order to avoid liability, but the employer must at least reasonably attempt to limit its effect once its begun. In this case, although it is a close call, viewing the evidence in favor of plaintiff, a reasonable jury could find that defendant failed to make reasonable efforts to stop the harassment of Miller. Thus, summary judgment must also be denied on this basis.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment on Count I is granted as to Miles and denied as to Miller. Summary judgment on Count II is granted as to both plaintiffs.

---

1. The following facts are taken from the parties' Local Rule 56.1 statements of material facts, as well as the exhibits attached thereto, and are either undisputed or have been viewed in "the light most favorable to the non-moving party." McCann v. Iroquois Mem'l Hosp., 622 F.3d 745, 752 (7th Cir. 2010) ("In determining if there was an issue of material fact . . . the court views the record in the light most favorable to the non-moving party, and draws all reasonable inferences in that party's favor."); see also Montgomery v. American Airlines, Inc., ___ F.3d ___, 2010 WL 4670173, at *3 (7th Cir. Nov. 19, 2010).

2. Plaintiffs also cite rumors that they were bringing drugs into the institution, and a July 14, 2006 incident in which a co-worker acted unprofessionally toward Miller. However, plaintiffs have failed to relate these accusations with anything having to do with their sex. See Yuknis v. First Student, Inc., 481 F.3d 552, 554 (7th Cir. 2007) ("[T]he creation of a hostile working environment is actionable under Title VII only when the hostility is to a group (or specific members of a group), such as women, whom the statute protects."). As such, these facts are not relevant to plaintiffs' Title VII claim and the court does not consider them.

3. Also, sometime prior to November 2004, Murray instructed Miles to stand up and turn around so that other LTS workers could state whether the length of her shorts was appropriate.

4. The parties do not direct the court to evidence of what happened with this charge.

5. Plaintiffs deny this fact. However, Miller acknowledged in her deposition that Assistant Warden Victor Trancoso "finally did have [Dietrich] moved because I made a big issue of it." The evidence cited by plaintiffs refers to the actions of Assistant Warden O'Neal and his prior failure to move Dietrich.

6. "The unwelcome conduct can be sexist-demonstrating animus toward women-or sexual." Berry v. Chi. Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010).

7. The court also notes that the sexual assault of Miller by an inmate is arguably out of place because it does not involve the rumors of which plaintiffs complain. Plaintiffs argue that the sexual assault could contribute to the jury's assessment of whether the rumors created a hostile work environment, arguing that the conclusion that the sexually harassing behaviors were threatening is even more likely where a sexual assault has occurred. The court will consider the sexual assault in this context only.

8. Defendant relies on Tinner v. United Insurance Co. of America, 308 F.3d 697, 708 (7th Cir. 2002). However, in Tinner, the court dealt with three discrete acts, not the cumulative effect of individual acts to support a hostile work environment claim. Id. at 709 ("Applying the Filipovic factors to the 1990, 1993, and 1994 incidents further demonstrates that each one represented a discrete act that became actionable according to Morgan when they occurred."); Ryan v. Town of Schererville, Ind., No. 2:03-CV-530, 2005 WL 1172614, at *5 (N.D. Ind. May 4, 2005) ("The Tinner court did not address the hostile work environment claim brought by Tinner, instead focusing upon three discrete acts which Tinner claimed were acts of discrimination.").

9. Defendant objects to Burnell's statements to plaintiffs as inadmissible hearsay. However, plaintiff is not offering Burnell's statements that Royer had sex with inmates for the truth of the matter asserted but rather to show its effect on Miller. See Cooper-Schut v. Visteon Auto. Sys., 361 F.3d 421, 430 (7th Cir. 2004) (holding in a hostile work environment case that the district court properly admitted testimony by plaintiff stating what another employee told her only for the effect that it had on plaintiff and not for the truth of the matter asserted). Thus, it can come in to establish plaintiff's case. As such, defendant's objection is overruled.

10. Miller did not report the comment by Murray but, rather, commented in her deposition that Murray's comment angered her because he knew that the rumors were common and frequently circulated and did nothing about it. Plaintiffs do not appear to argue this comment was harassment by a supervisor. Plaintiffs make no specific argument that this comment was part of the hostile environment alleged. To the extent that plaintiffs assert this singular comment by Murray was hostile conduct by a supervisor, the court finds that no reasonable juror could find that this comment

created a severe or pervasive environment.

11. Defendant has not objected to many of plaintiffs' statements of what other COs reported as hearsay. However, Miller does not direct the court to any testimony by any co-worker other than Miles. As such, all the statements of other coworkers to Miller or Miles are out-of-court statements by others. Each of these statements involves two layers of potential hearsay. The first layer being the statement the co-worker or inmate said directly to Miller or Miles, and second layer being what another co-worker said to the co-worker or the inmate who spoke with Miller or Miles. The first layer could be admitted solely to show its effect on Miller. See Cooper-Schut, 361 F.3d at 430. However, doing so would eliminate the proof that a co-worker actually said that the LTS was having sex with inmates, and leave only the statement by the first co-worker reporting the conduct. Because defendant does not raise this argument, the court will not address the issue. Regardless of whether others originally said the statement, co-workers commented to Miller that they had heard she was having sex with inmates, and the court takes these comments in that context.

12. Plaintiffs refer to the Faragher-Ellerth standard in their analysis of employer liability. However, these cases dealt with harassment by supervisors not co-workers. See Faragher v. City of Boca Raton, 524 U.S. 775, 780 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). "Harassment by co-workers differs from harassment by supervisors. Where the harasser is a supervisor and the victim suffered no tangible employment action, an employer is strictly liable, although there is the possibility of an affirmative defense." Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998) (alteration, citation, and quotation marks omitted). In a co-worker situation, as in this case, plaintiff bears the burden to show the employer has been negligent in discovering or remedying the harassment. Id.; see also Bernier, 495 F.3d at 373 (citing Dunn v. Wash. Cnty. Hosp., 429 F.3d 689, 691 (7th Cir. 2005)).

13. In the referenced deposition testimony, Miles states that she was not sure if she reported the Chino incident, but there was a probability she did. Construing this contested fact in the light most favorable to plaintiffs, the court finds a reasonable juror could find that this shows defendant's knowledge of this event. See McCann, 622 F.3d at 752.

14. Moreover, the fact that certain investigations turned up insufficient evidence also does not show a lack of reasonable action. Although Miller may have preferred a different result, the emphasis of Title VII in this context is not on redress but on the prevention of future harm. See Lapka, 517 F.3d at 984.